578 F.2d 912
 17 Fair Empl.Prac.Cas. 687, 16 Empl. Prac.
Dec. P 8306
William H. BOLDEN, III, on his own behalf and on behalf of
all others similarly situated, Plaintiffs,
v.
The PENNSYLVANIA STATE POLICE, Colonel James D. Barger,
Individually and in his capacity as Commissioner of the
Pennsylvania State Police, Milton J. Shapp, Individually and
in his capacity as Governor of the Commonwealth of
Pennsylvania, Ernest P. Kline, Individually and in his
capacity as Lieutenant Governor of the Commonwealth of
Pennsylvania and Chairman of the Governor's Affirmative
Action Council, Ronald G. Lench, Individually and in his
capacity as Secretary of the Office of Administration of the
Commonwealth of Pennsylvania, Richard Madison, Individually
and in his capacity as Director of the Bureau of Personnel
of the Commonwealth of Pennsylvania, Grace Hatch, John
McCarthy, C. Herschel Jones, Individually and in their
capacities as Chairwoman and Commissioners of the
Pennsylvania State Civil Service Commission, and Richard A.
Rosenberry, Individually and in his capacity as Executive
Director of the Pennsylvania State Civil Service Commission.
Appeal of applicants for intervention, Danny R. McKNIGHT,
John Dudinskie and Albert Minnick, on their own behalf and
on behalf of all Pennsylvania State Police Lodges of the
Fraternal Order of Police, in No. 77-2323.
Appeal of applicants for intervention Robert W. McDONALD and
Donald S. Millard, Jr., on their own behalf and on
behalf of others similarly situated, in
 No. 77-2390.
 Nos. 77-2323, 77-2390.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 4, 1978.
Decided April 17, 1978.
 
 David Kraut, Germaine Ingram, Community Legal Services, Inc., Philadelphia, Pa., for plaintiffs-appellees.
 Norman J. Watkins, Jeffrey Cooper, Deputy Attys. Gen., J. Justin Blewitt, Jr., Deputy Atty. Gen., Chief, Civil Litigation, Robert P. Kane, Atty. Gen., Pa. Dept. of Justice, Harrisburg, Pa., for defendants-appellees.
 Gary M. Lightman, Mancke & Lightman, Harrisburg, Pa., Roger A. Clark, John H. C. Barron, Jr., Rogers & Wells, Washington, D. C., for appellants.
 Before SEITZ, Chief Judge, and GIBBONS and GARTH, Circuit Judges.
 OPINION OF THE COURT
 GIBBONS, Circuit Judge.
 
 
 1
 This is an appeal from an order denying three applications to intervene as parties-defendants for the purpose of seeking temporary relief from and permanent modification of a final judgment. The final judgment at issue was entered by consent on June 20, 1974, and modified by the district court on November 29, 1976. It disposed of a complaint by William H. Bolden, III, and others charging the Commonwealth of Pennsylvania with racial discrimination in the hiring and promotion practices of the State Police, in violation of the thirteenth and fourteenth amendments and of 42 U.S.C. §§ 1981, 1983, 1985(3), and 1988.[1] The consent judgment was entered after substantial discovery and after the completion of the plaintiffs' case, which consisted in part of a detailed stipulation by the defendants admitting discriminatory practices in selection and promotion by the State Police. The defendants at that time were the Pennsylvania State Police, a legislatively created agency of the Commonwealth, and a number of government officials responsible for its operations. The judgment mandated class action relief.
 
 
 2
 The present applicants for intervention do not contend that the discrimination charged in the complaint, and shown by the evidence in the plaintiffs' case, did not occur. They seek modification only of the remedial provisions of the judgment. Each motion for intervention seeks to modify the judgment in four respects:
 
 
 3
 (1) to establish a mandatory schedule for the defendants to submit validated hiring and promotion criteria for court approval (the validation claim);
 
 
 4
 (2) to terminate the hiring and promotion quotas immediately, or at the latest when valid hiring and promotion criteria are adopted (the quota claim);(3) to restore seniority as a criterion for promotion and to grant retroactive seniority to any person shown to have been an actual victim of racially discriminatory employment or promotion practices (the seniority credit claim);
 
 
 5
 (4) to adjust the work force statistics to reflect a lower representation of minorities in the work force from which the State Police draws its employees (the minority goal claim).
 
 
 6
 The applicants for intervention, all of whom are represented by the same attorneys, are divided into three distinct groups. Danny R. McKnight, John Dudinskie, and Albert Minnick are non-minority State Police officers who seek to represent a class consisting of all non-minority officers who would have been promoted but for the operation of the decree (the McKnight class). Robert W. McDonald and Donald S. Millard, Jr., are non-minority applicants for appointment to the State Police who seek to represent a class consisting of all non-minority applicants who would have been appointed but for the operation of the decree (the McDonald class). Finally, there is the Conference of Pennsylvania State Police Lodges of the Fraternal Order of Police (FOP), an unincorporated association which functions as a collective bargaining agent for State Police officers. It is not disputed that the litigation on behalf of each class of applicants for intervention is being managed and financed by the FOP.[2]
 
 
 7
 The McDonald and the FOP motions to intervene were filed on August 1, 1977. An amended McKnight motion, filed on April 27, 1977, had already been under consideration for several months. After an evidentiary hearing, the district court issued an order dated October 12, 1977, which denied all three motions and declined to modify the judgment Pendente lite. The court's opinion in support of that order was filed on December 2, 1977 (C.A. 73-2604).
 
 
 8
 Since it is clear that the real motive force behind each motion is the FOP, a history of its involvement in this case would prove enlightening. The FOP first came on the scene in March, 1974, when during the trial on Bolden's complaint attorney Howard Richard appeared for Leo Pierce, individually and as Chairman of the FOP. Richard moved that Pierce be permitted to intervene as a defendant to protect the interests in promotion and other benefits of State Police officers who might be affected by the judgment. While this motion was still Sub judice, the Attorney General of Pennsylvania appointed Richard, who regularly represented the FOP in collective bargaining, an Assistant Attorney General authorized to participate in the defense of the Bolden action. Richard thereupon withdrew Pierce's motion to intervene.
 
 
 9
 The reason for this unusual series of events is disclosed by Exhibit 1 of the applicants for intervention, the transcript of a meeting held on April 20, 1974, shortly before the consent decree was submitted to the court. The meeting was attended by representative members of the FOP and presided over by Col. James D. Barger, Commissioner of the State Police. The transcript reveals the following dialogue:
 
 
 10
 COL. BARGER: (D)uring the course of that suit down there the FOP was brought into it and at a meeting a little over a week ago it was decided at a meeting with the Governor and the Attorney General that we would let Mr. Richard sit as co-counsel with (Assistant Attorney General) Ben Lerner to represent the Pennsylvania State Police. And so, I think you ought to know this at that time, I took it on myself to tell Mr. Richard that we, the State Police, would pick up the tab for his counseling down there but I have been told by the Attorney General that we will not. So, that's held in abeyance. I don't know whether did you have an opportunity to see the Attorney General today, Mr. Richard?
 
 
 11
 MR. RICHARD: Yes. I spoke to the Attorney General today and he has reinstated it they will pick up the tab. (Applause) . . . .COL. BARGER: I felt that we should because he was representing the Pennsylvania State Police and not specifically the FOP and I don't think anybody here and this would probably amount to $100 out of each man's pocket. That's the reason I felt that the State Police should pay for it, and I think we could probably get it out of our budget after its (Sic ) all over.
 
 
 12
 Richard then took the floor and explained his participation in the negotiation of the proposed consent decree and the reasons why he favored each feature of it, including the four provisions now challenged by the intervenors. He also described the case of De Funis v. Odegaard, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974), the "reverse discrimination" challenge then pending before the Supreme Court. He continued:
 
 
 13
 When we filed the motion to intervene in your behalf, the court didn't allow it. They just put it aside. Therefore, technically, you, the individual men, are not parties to this suit. We haven't given up your individual rights. And, it may be depending on the decision of the De Funis case and the language that is what they base their decision on, it may be that what you say is so, that this may as applied here be reverse discrimination. I can't tell you now. Your rights have not been waived, but have been reserved. And, therefore, it may be in that situation that we may have a subsequent litigation if that becomes necessary.
 
 
 14
 I am in there now, as co-counsel for the State of Pennsylvania. My motion to intervene has not been allowed and I'm not going to let the Court let me in if he wants me in now in that capacity, I'm not going to let him bring me in. I'm going to withdraw, so that you are not parties to it.
 
 
 15
 It is perfectly clear from this Exhibit that the FOP was seeking on behalf of its members the best of all possible worlds. Its counsel, paid by the Commonwealth, could supplant, or at least supplement, the Assistant Attorney General assigned to the case in negotiating the most favorable consent decree, while it preserved the option of subsequently mounting collateral attacks on the same decree. Richard explained the strategy in these words:
 
 
 16
 If this is done, this will be a Consent Decree. Now, this will not affect the rights of any individual man to bring a suit as DeFunis did, if he feels that his rights have been taken away from him. But, there would be no appeal by any of the eight defendants, the Governor of Pennsylvania, State Police and so forth.
 
 
 17
 In colloquial terms, Richard was trying to whistle and chew meal at the same time: he was attempting to separate his representation of the Commonwealth from his representation of his union-member clients.
 
 
 18
 The FOP knew and approved of Richard's role. Before polling the meeting, Col. Barger explained that he had throughout the litigation opposed any consent decree.
 
 
 19
 But then (he continued) when your attorney who represents you, got interested in it, and went down there and became co-counsel then I felt it did not rest solely on my shoulders. I have felt it rested on everyone's shoulders to decide now, are you going to let your attorney and the State Police attorney go down there and say well, we don't like it but we're going to have to accept it. Or, are you going to say no, we're not going to accept any Consent Decree as I originally said, that's up to you gentlemen. . . . Now, I'm not saying that I agree with it or that I disagree with it because its (Sic ) your attorney now who sat in as co-counsel and made these stipulations.
 
 
 20
 At the end of the meeting, Col. Barger tallied the vote as 134 in favor of the consent decree and 27 opposed.
 
 
 21
 The FOP's strategy of collaterally attacking the consent decree negotiated by its attorney, in the guise of representing the Commonwealth, was soon pursued. Six months after the consent decree was entered, two civil actions challenging its validity were filed in the Middle District of Pennsylvania. Those actions were subsequently transferred to the Eastern District of Pennsylvania and assigned to the district judge who had retained jurisdiction over the original case. These suits challenged certain eligibility criteria established by the consent decree for appointment to the State Police cadet class. The decree provided that until a new examination should be validated as job-related, the old examination should be retained and those scoring 60 or more should be deemed qualified. At least one-third of those selected for appointment to the State Police Academy would be minority group members, until 9.2 percent of the force was drawn from minority groups.
 
 
 22
 In the case entitled Oburn v. Shapp (C.A. 65-619) the named plaintiff sought to represent all non-minority applicants in a challenge to the interim standards. The FOP was also a plaintiff seeking to challenge not only the interim eligibility standards, but also the promotion procedures. In the case entitled Lutz v. Shapp (C.A. 73-631) the plaintiffs were non-minority applicants seeking to challenge provisions of the interim eligibility standards dealing with applicants who had scored over 92 on the examination. The cases were consolidated in the district court, and in both the plaintiffs moved for a preliminary injunction. That motion, which concerned only the interim eligibility standards and not the interim promotion standards, was denied on the ground that the plaintiffs had not demonstrated either a reasonable probability of eventual success or irreparable injury sufficient for Pendente lite relief. Oburn v. Shapp, 393 F.Supp. 561 (E.D.Pa.1975). The plaintiffs appealed pursuant to 28 U.S.C. § 1292(a), but this court affirmed the decision below. Oburn v. Shapp, 521 F.2d 142 (3d Cir. 1975).
 
 
 23
 Thereafter, at the trial on the merits, the defendants in Oburn and Lutz, who were also defendants in the original Bolden case, moved to dismiss the complaints: (1) because the suits were improper collateral attacks on the consent decree; (2) because the FOP lacked standing to challenge the decree on the grounds asserted; (3) because the FOP and its members were collaterally estopped by their participation in the Bolden case; and (4) because the complaint failed to state a claim upon which relief could be granted. Finding the complaints "improper collateral attacks upon a consent decree over which this court continues to exercise jurisdiction," the district court dismissed them "for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure." Oburn v. Shapp, 70 F.R.D. 549, 553 (E.D.Pa.1976). The district court, therefore, did not rule on the defendants' standing contention, on the collateral estoppel contention, or on the contention that the complaint failed to state a claim upon which relief could be granted. On appeal, this court affirmed the order without opinion, 546 F.2d 418 (3d Cir.1976), and on April 18, 1977, the Supreme Court denied certiorari, 430 U.S. 968, 97 S.Ct. 1650, 52 L.Ed.2d 359 (1977).
 
 
 24
 Almost immediately, the McKnight application was filed, and shortly thereafter came the McDonald and FOP applications. This time the district court simultaneously disposed of the applications for intervention and the motion for preliminary injunctive relief. After denying the applications to intervene, the district court, in its order of October 12, 1977, continued:
 
 
 25
 assuming Arguendo, that intervention had been granted, the Court finds that proposed intervenors have not proven that (1) they have a reasonable probability of eventual success in the litigation and, (2) they will be irreparably injured Pendente lite if the requested relief is not granted.
 
 
 26
 In its opinion supporting the October 12 order, the court found:
 
 
 27
 The evidence is overwhelmingly supportive of the proposition that Mr. Richard represented the interests of the FOP only. There is no doubt that from the moment he petitioned to intervene on behalf of Leo Pierce, and participated in the consent decree negotiations, to the moment he withdrew the petition, Howard Richard was acting with only the best interests of the FOP in mind. The designation of Mr. Richard as an Assistant Attorney General was a procedural maneuver to assure FOP representation and control of the proceedings at the expense of the Commonwealth. Thus we find participation and control sufficient to bind to the consent decree the FOP and the applicants for intervention it now sponsors.
 
 
 28
 The finding of the FOP's participation is clearly supported by the evidence of record in particular by the evidence of what transpired at the April 20, 1974 meeting. On the basis of that finding, we will proceed on the assumption that the FOP was a party-defendant in the Bolden litigation. Thus, the FOP's appeal presents not the question whether it should be permitted to intervene, but the question whether it should be permitted to move to modify the decree.[3] Treating the FOP's appeal as presenting the latter question, we must then determine: (1) what class is bound by the FOP's participation in Bolden, (2) on what issues that class is bound, and (3) whether any showing has been made which would warrant relief. If we determine that under Hansberry v. Lee, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940), the FOP was not an adequate class representative for some of the interests affected by the judgment, then we must determine (1) whether those interests were adequately represented, and if not, (2) whether intervention should now be permitted for the purpose of seeking the modification of the decree. Neither of the prior appeals in which the FOP participated decided any of these questions: the first appeal raised only the propriety of the denial of Pendente lite relief, while the second appeal raised only the propriety of collaterally attacking a judgment in a separate lawsuit.
 
 
 29
 In Equal Employment Opportunity Commission v. American Tel. & Tel., 506 F.2d 735 (3d Cir.1974), this court held that a labor organization could properly intervene to protect the interests of members who might be adversely affected by the proposed provisions of a consent decree. Necessarily implicit in that holding were the principles that a labor organization is an adequate representative of the interests of the majority of its members; that its participation satisfies the due process requirements of Hansberry v. Lee; and that insofar as its interests are not antagonistic to those of the majority of its members, the members are bound by the judgment. Since the FOP was an actual participant in the Bolden case, we think the decree effectively bound all those whose interests were not antagonistic to it. At a minimum, this includes all non-minority State Police officers who might be adversely affected by the decree.
 
 
 30
 That class is interested in the validation claim to the extent that it affects promotion examinations, the quota claim to the extent that it affects promotions, the minority goal claim to the extent that it affects promotions, and the seniority credit claim. It is not interested in the validation of entrance examinations, the new hiring quotas, or the minority hiring goal claim. These provisions affect non-minority applicants rather than employed State Police officers. In fact, however, the FOP has throughout the proceedings (except in negotiating the consent decree) favored the positions now espoused by the McDonald class of non-minority applicants. No party to this appeal has suggested that the interests of the FOP and those of the non-minority applicants are antagonistic. For Hansberry v. Lee purposes, the FOP was probably an adequate representative of the class interests of non-minority applicants as well. We need not, however, decide that question, for it would appear that with respect to the provisions of the consent decree which affected the non-minority applicant class, the state government defendants were adequate representatives. See Commonwealth v. Rizzo, 530 F.2d 501, 505 (3d Cir.), Cert. denied sub nom., Fire Officers Union v. Pennsylvania, 426 U.S. 921, 96 S.Ct. 2628, 49 L.Ed.2d 375 (1976). Regarding each feature of the consent decree which affects non-minority applicants, the state officials would not appear to have had any interest adverse to that class at the time the decree was negotiated.
 
 
 31
 The seniority credit provision presents, however, a different issue. The state government defendants are also employers. Their interest was potentially and in the event proved to be actually antagonistic to that of the FOP with respect to seniority credits. But the applicant class is affected by the seniority credit provision only in a remote and speculative manner, since it operates only on those already employed. The class of non-minority officers is, as we said above, adequately represented by the FOP. We conclude, therefore, that between the governmental defendants and the FOP, all classes affected by the four features of the consent decree were adequately represented. The decree, therefore, binds them. Hansberry v. Lee, 311 U.S. at 43, 61 S.Ct. 115.
 
 
 32
 As an alternative ground for denying intervention, the district court held:
 
 
 33
 Even if we assume, contrary to the fact, that the FOP did not fully participate in and control the negotiations for the consent decree, it is clear that applicants have not demonstrated a basis of right or a permissive basis for intervention pursuant to Fed.R.Civ.P. 24(a) or (b).
 
 
 34
 The court reasoned that the applicant class members were adequately represented, that the motions to intervene were untimely, and that late intervention would prejudice other parties. We have already concluded that the governmental defendants and the FOP adequately represented all class members adversely affected by the challenged provisions of the decree. Since the entry of the decree, however, it is possible that the interests of the McDonald class applicants may not be adequately represented by existing parties. See Fed.R.Civ.P. 24. In that case, the recognition of either the governmental defendants or the FOP as class representative of the McDonald class for the purpose of applications to modify the decree might not meet the due process standards of Hansberry v. Lee. The timeliness of the application for intervention would, we think, be determined by reference to the time elapsed since any alleged conflict arose.
 
 
 35
 Having denied intervention by any of the three applicants, the district court then proceeded to consider the grounds advanced for the proposed modifications. There is an ambiguity here: while the October 12 order disposed only of the applications to intervene and of the motions for Pendente lite relief from the challenged features of the judgment, the opinion, released almost two months later, might be construed as disposing of the claims for modification finally and on the merits. Since appeals lie from judgments, not from opinions, it is to the October 12 order that we look to determine what was actually decided. We conclude that no more was decided than is there reflected, and thus that the district court did not rule finally on the merits of the requests for modification. Apparently no more was intended, for while the opinion finds that the FOP participated fully in negotiating the Bolden consent decree, it nowhere discusses whether the FOP can move for modification pursuant to Article VIII of the decree,[4] although such relief was requested.
 
 
 36
 There are, therefore, three questions for decision on this appeal. The first is whether intervention was properly denied. The second is whether Pendente lite relief from the operation of the decree was properly denied. The third is whether the district court should have considered the motions for modification on the merits. The first and third questions are interrelated: if intervention was properly denied because the FOP was already in the case, it follows that, like any other party, the FOP should be able to apply for modification under Article VIII. Since we have already affirmed the district court's finding that the FOP was a participant in the Bolden lawsuit, we conclude that the district court should rule on that request. Because we cannot tell from the present record whether or not the McDonald class should now be separately represented, we think their request for intervention should be reconsidered.
 
 
 37
 We turn, finally, to the one remaining question, whether Pendente lite relief was properly denied. The standards for answering that question are explained in Judge Garth's opinion in the first Oburn appeal, 521 F.2d 142 (3d Cir. 1975), and need not be repeated here. On the substantive issue, Judge Garth dealt with a preliminary challenge to the hiring quotas in this decree. For the same reasons advanced in that opinion, we hold that the district court did not err in rejecting the application for Pendente lite relief from the interim hiring provisions. The FOP has not shown a reasonable probability of eventual success in challenging those provisions, has not shown irreparable injury, and has not shown that the requested relief would advance the public interest.
 
 
 38
 The earlier decision did not, however, deal with the other three requested modifications. In the first of these, the validation claim, the FOP criticized that part of the decree which directs the defendants to retain an independent and qualified expert to produce validated job-related tests for the employment and promotion of State Police officers. The complaint is that the expert is taking far too long. On this claim the district court ruled:
 
 
 39
 Intervention for this purpose is unnecessary. A stipulated detailed timetable has already been established.
 
 
 40
 Proposed intervenors also suggest that they should be permitted to intervene so they may participate whenever court approval is sought to validate various selection or promotion procedures. Presently, there is no such material before the Court. In the past, we permitted limited intervention as requested by the FOP to challenge certain promotion criteria. Of course, the Court will consider a petition for such limited intervention when timely presented.
 
 
 41
 (footnotes omitted). While this discussion suffers from the ambiguity we noted earlier, we think its substance is a ruling that the FOP has not shown the need for Pendente lite modification of the timetable for validation. The record shows that this timetable was stipulated by attorneys for the plaintiffs, the defendants, and the applicants for intervention. Stipulation, Docket No. 150. Applying the standards for review set out in Oburn, we conclude that the district court did not err in denying further temporary relief.
 
 
 42
 The second proposed modification concerns seniority credits. This time the FOP's theory is that the law has changed since the consent decree. Since what is before us is an order denying relief Pendente lite, our initial inquiry must be whether the FOP has shown a likelihood of ultimate success on the merits. The FOP argues that the decisions in Franks v. Bowman Transportation Co., 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976), International Brotherhood of Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), and United Airlines, Inc. v. Evans, 431 U.S. 553, 97 S.Ct. 885, 52 L.Ed.2d 571 (1977), have made illegal the elimination of seniority as a criterion for promotion. In Mayberry v. Maroney, 558 F.2d 1159 (3d Cir. 1977), this court referred to the heavy burden imposed on a party seeking relief from a final judgment on the ground of precedential evolution. The burden of obtaining Pendente lite relief on that ground is even heavier.
 
 
 43
 We are not dealing in this case with a judgment enforcing an unconstitutional statute. In such a case, the applicant's burden is necessarily lighter. See Neely v. United States, 546 F.2d 1059 (3d Cir. 1976). The FOP does not suggest that the facts which justified the injunction have changed. See United States v. Swift & Co., 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932). Nor does it attempt to analogize this case to a case in which, by virtue of other decisions, one firm in an industry is subject to more rigorous requirements than are imposed on its competitors. See American Iron and Steel Institute v. Environmental Protection Agency, 560 F.2d 589 (3d Cir. 1977). Instead, the FOP's argument amounts to no more than a claim that the Supreme Court has made a non-constitutional decision which interprets a remedial statute in a manner inconsistent with prior decisions of this court. But the statute involved in the three recent decisions, Title VII of the Civil Rights Act of 1964, was not the predicate for relief in this case. Before we could find those three cases relevant here, we would have to impute to the second session of the Eighty-eighth Congress the intention to circumscribe the remedial powers of the federal courts under §§ 1981, 1983, 1985, and 1988. We find nothing in Franks v. Bowman Transportation Co., International Brotherhood of Teamsters v. United States, or United Airlines, Inc. v. Evans to support such a construction of § 703(h) of Title VII. Nothing in the legislative history of that section supports it. Moreover, the settled law in this circuit is that there is a distinction, when relief is sought under Title VII, between violations of § 703(h) and remedies under § 703(g). Equal Employment Opportunity Commission v. American Tel. & Tel., 556 F.2d 167 (3d Cir. 1977), Cert.denied, --- U.S. ----, 98 S.Ct. 3145, 57 L.Ed.2d 1161 (1978); United States v. International Union of Elevator Constructors, 538 F.2d 1012 (3d Cir. 1976). Viewing all these obstacles to the requested relief, we conclude that there was so little likelihood of success on the merits that the district court properly denied Pendente lite relief from the provision in the decree eliminating seniority credits in promotion.
 
 
 44
 The FOP's final challenge was to the minority employment goal of 9.2 percent. That figure is equal to the minority population of the Commonwealth as a whole. The FOP contends that the population of Philadelphia and Pittsburgh should be excluded because the State Police provide only limited service in those cities. The FOP relies on Hazelwood School District v. United States, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977), and on United States v. International Union of Elevator Constructors, supra, for an alleged change of law. According to the FOP, those cases hold that, for purposes of an employment goal, the relevant minority population is that in the geographic area in which the job opportunities exist, as reflected in actual applicant flow data. We do not, however, read the cases that way. Each case involving class action injunctive relief presents the problem of defining the universe to which that relief applies. The issue is more factual than legal, and the opposing parties always contend for a more or less inclusive universe, depending upon which will advance their interest.
 
 
 45
 Whether to include the minority population of Philadelphia and Pittsburgh was warmly disputed in the original Bolden litigation. The transcript of the April 20, 1974 meeting discloses that Lerner, the Assistant Attorney General, discussed the question at length and advised the FOP to consent to the 9.2 percent minority goal. He argued, first, that the figure would be included in a litigated decree and, second, that conceding that point in negotiations had produced a concession by the plaintiffs on another issue. App. 241-43. Having negotiated a consent decree, the FOP now wants to introduce evidence on actual applicant flow data which would justify a lower minority employment goal. As with the FOP's other contentions, we must look first to the likelihood of ultimate success on the merits. We have no hesitation in holding that the likelihood of reopening a settled case for the purpose of litigating disputed factual matters is so slight that the district court properly denied Pendente lite relief from the 9.2 percent minority goal.
 
 
 46
 The order appealed from will be affirmed insofar as it denies preliminary relief from the operation of the June 20, 1974 judgment and insofar as it denies the motions to intervene by the McKnight class. Insofar as it denies the motion to intervene by the McDonald class, the order will be vacated and remanded for consideration of the question whether the existing parties adequately represented the members of that class at the time the petition to intervene was filed.[5] Because the order is unclear as to the exact status of the FOP, it is as to that appellant vacated and remanded for the entry of an order denying the FOP's motion to intervene on the ground that it is a party-defendant bound by the judgment. The FOP may, of course, like any other party, move to modify the decree pursuant to Article VIII thereof.
 
 
 47
 GARTH, Circuit Judge, concurring in part and dissenting in part.
 
 
 48
 I agree with the majority's analysis, which concludes that the FOP was a party in fact to this litigation and that FOP was an adequate representative of the McKnight (the non-minority police officer) class. I therefore concur with that part of the majority opinion which affirms the district court's order denying FOP's and the McKnight class's application for intervention for that reason.[1] I also join the majority opinion insofar as it affirms the district court's denial of preliminary injunctive relief. However, I cannot agree with the majority's analysis as it concerns the McDonald (the non-minority applicants) class's right to intervene. Inasmuch as I believe that the district court erred in refusing to grant the McDonald class's intervention application, I would reverse that part of the district court's order which denies the McDonald class's (applicants') motion to intervene. Since the majority only proceeds part way to that result by remanding for reconsideration of the McDonald class's application to intervene, rather than reversing the district court's order outright, I must respectfully dissent.
 
 
 49
 * Rule 24(a) provides that "upon timely application" intervention shall be permitted if the "applicant claims an interest relating to the . . . transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest." Intervention is not required to be granted, however, if the "applicant's interest is adequately represented by existing parties."
 
 A. INTEREST AND IMPAIRMENT
 
 50
 It is clear beyond peradventure that the applicants have an interest relating to the subject of the action, since the Consent Decree, by imposing hiring quotas and hiring criteria, directly affects the probability of their being accepted for employment by the State Police. It is also clear that the applicants' ability to protect that interest may as a practical matter be impaired by the operation of the Consent Decree, in that the Decree would bind the State Police to hiring practices which would undoubtedly affect the applicants and these practices are not subject to collateral judicial attack. Oburn v. Shapp, 70 FRD 549 (E.D.Pa.1974), Aff'd without opinion, 546 F.2d 418 (3d Cir. 1976), Cert. denied, 430 U.S. 968, 97 S.Ct. 1650, 52 L.Ed.2d 359 (1977). See generally Cascade Natural Gas Co. v. El Paso Natural Gas Co., 386 U.S. 129, 87 S.Ct. 932, 17 L.Ed.2d 814 (1967); 7A Wright & Miller, Fed.Prac. & Proc. § 1908 (West 1972).
 
 B. ADEQUACY OF REPRESENTATION[2]
 
 51
 The majority's treatment of the non-minority applicants' right to intervene is premised on a presumption that a state, in the kind of "public" litigation involved in this case, at least initially adequately represents its citizens including, therefore, the non-minority applicants. I agree with the general proposition that a party charged by law with representing the interests of an absentee (I. e., one not a party to the litigation) will in most instances be deemed adequate to represent the absentee, and that therefore it will generally be assumed that a state, or governmental body or officer, adequately represents the interests of its citizens. See Commonwealth v. Rizzo, 530 F.2d 501, 505 (3d Cir.), Cert. denied, 426 U.S. 921, 96 S.Ct. 2628, 49 L.Ed.2d 375 (1976)[3]; Illinois v. Bristol Myers, 152 U.S.App.D.C. 367, 470 F.2d 1276 (1972) (per curiam); United States v. Board of School Commissioners of City of Indianapolis, 466 F.2d 573 (7th Cir. 1972); Wright & Miller, Supra, § 1909, at 525. I also agree that this presumption must exist, in order that those represented by the state may be deemed bound by any order that may be entered in the litigation. Thus I am willing to concede that during the negotiations leading to the entry of the Consent Decree, the non-minority applicants (as well as others) were presumptively represented in adequate fashion by the State defendants.
 
 
 52
 However, the existence of such a presumption of adequate representation does not mean that intervention must necessarily be denied. Wright & Miller, Supra, § 1909, at 529. See, e. g., Trbovich v. UMW, 404 U.S. 528, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972); Johnson v. San Francisco Unified School District, 500 F.2d 349 (9th Cir. 1974); Smuck v. Hobson, 132 U.S.App.D.C. 372, 408 F.2d 175 (1969); Holmes v. Government of the Virgin Islands, 61 FRD 3 (D.V.I.1973); Brennan v. Steamfitters, Local No. 449, 64 FRD 663 (W.D.Pa.1974). The state's representation can be deemed adequate only so long as no interest adverse to the state appears. Once it becomes apparent that there is a present interest which is adverse to the interest represented by the state, then the presumption of adequacy of representation disappears. In such a situation the proposed intervenor "cannot be required to look for adequate representation to one who is his opponent. . . ." Wright & Miller, Supra, § 1909, at 525.
 
 
 53
 In this case, until such time as the State which ostensibly represented all of its citizens entered into the Consent Decree, the interests protected (and therefore adequately represented by the State) were not clearly adverse to those of the non-minority applicants. It was only when the operative aspects of the Consent Decree became known that the non-minority applicants were in a position to assert interests antagonistic to the Decree.[4] Thus it seems to me that once the Consent Decree was signed, a discrete and recognizable class (such as the non-minority applicants), which claimed an adverse and affected interest, must be permitted intervention if the requirements of Fed.R.Civ.P. 24(a) were satisfied as of the time that their petition to intervene was filed.
 
 
 54
 I do not believe that, at the time the petition for intervention was filed by the McDonald class, it can be said that the State was adequately representing the interests of McDonald and his class of non-minority applicants. The State defendants had no real interest in expediting the development of validated job-related hiring criteria, while the applicants clearly did (since strict 2:1 or 1:1 non-minority to minority hiring quotas were to remain in effect until such criteria were developed). Moreover, the very fact that the State Police have consented to significant aspects of the Decree (such as minority hiring quotas and the achievement of the 9.2% Minority goal) which, while having no apparent effect on the operations of the police, adversely affect the non-minority applicants, attests to a divergency of interest. See, e. g., Johnson v. San Francisco Unified School District, supra, in which the court held that parents of Chinese elementary school students, and a group of racially mixed parents, should be allowed to intervene in a desegregation suit against the School District brought by parents of black children. The Johnson court ruled that the School District, which was "charged with the representation of all parents within the district," did not "adequately represent (the proposed intervenors') distinct viewpoint." 500 F.2d at 354.[5] In the case Sub judice, the "distinct viewpoint" of the McDonald class argues strongly for the need for separate representation.
 
 
 55
 Nor can it be said that FOP is an adequate representative of the non-minority applicants for Rule 24(a) purposes. It may be that FOP to date has vigorously advocated the positions which the applicants would have espoused. But this does not necessarily mean that FOP is an adequate representative, since the interests of FOP, representing the non-minority police officers, are by no means identical to the interests of the non-minority applicants. Quite to the contrary, FOP and the present police officers have a much stronger and more direct interest in the Promotion features of the Consent Decree, rather than the Hiring features with which the applicants are primarily concerned. This difference in interest and emphasis is highly significant, especially in the give and take of the negotiation process. For example, it is conceivable indeed it is entirely possible that FOP might make a tactical decision to trade-off hiring quotas or minority goal achievement for a more favorable promotion ratio or for a restoration of seniority as a promotion criterion. In such a circumstance I. e. if FOP attempts to give up something the applicants want in order to get something its member-officers want the applicants should be able to protect their own interests. Unless that class is formally a party to the litigation, they will be unable to do so. When the interests of a party and a proposed intervenor inherently conflict as do the interests of FOP and those of the applicants the fact that the party (FOP) may have advocated or financed the proposed intervenor's position cannot be deemed to qualify that party (FOP) as an adequate representative of the proposed intervenors (the non-minority applicants). Indeed, one can only assume, given the intrinsic conflict of interest, that FOP's advocacy of a position favorable to the applicants was in its own (I. e. FOP's) interest, and was not necessarily undertaken in the interest of the applicants.
 
 
 56
 As long as there is a serious possibility that the representation May be inadequate, intervention in a situation such as the one presented here must be allowed. See Wright & Miller, Supra, § 1909, at 533. All reasonable doubts should be resolved in favor of permitting the proposed intervenor to be heard in his own and his class's behalf. Id. For the reasons stated in the preceding discussions, I believe that the McDonald class May not be adequately represented by the State or by FOP. Thus, given the "minimal" test of inadequate representation, See Trbovich v. UMW, 404 U.S. 528, 538 n. 10, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972), it is my opinion that the district court erred in concluding that the non-minority applicants' interests were adequately represented.
 
 C. TIMELINESS
 
 57
 In my opinion, the applicants' petition to intervene was timely,[6] although this question is admittedly a troublesome one, since the application was made three years after the Consent Decree was signed.[7] The district court, in ruling that the intervention petition was untimely, relied primarily on this three year interval between the execution of the Consent Decree and the intervention application. Dist.Ct.Mem.Op., No. 73-2604 (E.D.Pa. Dec. 2, 1977), at 11 (Plaintiffs-Appellees' Supp.App. at 11). By focusing almost wholly on the three year interval, the district court, in my view did not properly exercise its discretion.
 
 
 58
 The three-year time lapse becomes much less foreboding, however, when the timing of the intervention petition is viewed in light of the applicants' three major claims. Indeed, a close examination of the claims raised by the non-minority applicants reveals that the intervention petition was in fact most timely.
 
 
 59
 The proposed intervenors' first claim concerns the 1:1 non-minority to minority hiring ratio. This ratio was imposed by the district court in an order modifying the Consent Decree, entered on November 29, 1976, Less than five months prior to the April, 1977 petition for intervention. Prior to the modification, the hiring ratio had been 2:1.
 
 
 60
 The second claim concerns the calculation of a minority goal of 9.2 percent. The applicants' arguments are focused on the recent Supreme Court case of Hazelwood School District v. United States, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977), which was handed down a month After the intervention application was filed. The applicants allege that Hazelwood, as well as our relatively recent opinion in United States v. International Union of Elevator Constructors, 538 F.2d 1012 (3d Cir. 1976), constitute a change of law which requires the relief sought. The impact of Hazelwood and Elevator Constructors on the terms of the Consent Decree is not clear, and, as the majority points out, those cases may not require the modification of the decree. But certainly the cases are relevant, and may render parts of the Decree inconsistent with the law as explicated by the Supreme Court. It seems to me that the proposed intervenors should be permitted to raise these issues in the context of their own interests, since the State which is the only defendant presumed by the majority to represent the applicants gave no indication that it would pursue those interests, and since FOP, as the other defendant, cannot be deemed an adequate representative of the applicants (as I have pointed out above). See Jordan v. School District of the City of Erie, 548 F.2d 117 (3d Cir. 1977) (which held that a court had the power to modify a consent decree to conform to subsequent Supreme Court decisions). See also System Federation No. 91 v. Wright, 364 U.S. 642, 647, 81 S.Ct. 368, 371, 5 L.Ed.2d 349 (1961) ("a sound judicial discretion may call for the modification of the terms of an injunctive decree if the circumstances, whether of Law or fact, obtaining at the time of its issuance have changed, or new ones have arisen" (emphasis added)). Admittedly Jordan and System Federation go to the power to modify, not the timeliness of intervention. But if a decree "has (allegedly) been turned through changing circumstances into an instrument of wrong," United States v. Swift & Co., 286 U.S. 106, 115, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1930) (Cardozo, J.), then it seems to me that an affected non-party with a clear and strong interest has a right to intervene in order to protect that interest. This is especially so when, as here, the decree had and has a continuing and on-going effect.[8]
 
 
 61
 The applicants' third claim is essentially one for enforcement of that part of the Decree which mandates the creation of validated job-related hiring criteria. They contend that the parties have delayed unduly in complying with this aspect of the Decree, and they seek to expedite the development of the criteria.[9] Certainly the applicants could not move to correct this delay until the delay had occurred.
 
 
 62
 In sum, it appears that there was no substantial delay between the events which gave rise to the applicants' claims for relief (the imposition of a 1:1 ratio, an alleged change of law, and the alleged undue delay in developing hiring criteria) and the petition for intervention. See Liddell v. Caldwell, 546 F.2d 768 (8th Cir. 1976), Cert. denied, 433 U.S. 914, 97 S.Ct. 2987, 53 L.Ed.2d 1100 (1977).
 
 
 63
 The other most important factor which is to be considered in determining if an intervention application is untimely is prejudice to other parties due to the delay. Commonwealth v. Rizzo, supra; Nevilles v. EEOC, 511 F.2d 303 (8th Cir. 1975); Wright & Miller, Supra, § 1908. In Commonwealth v. Rizzo, supra, we refused to permit intervention after judgment because of prejudice to both plaintiffs and defendant: "Extensive discovery has been undertaken and completed, all critical issues have been resolved, and a final Order has been entered. The interest in basic fairness to the parties and expeditious administration of justice mandates the denial of the motion to intervene." 530 F.2d 507.[10] In the circumstances of this case, however, there could be no substantial prejudice to the parties or to the orderly administration of justice if intervention is ordered. First, this court has already determined that FOP (representing the present non-minority state troopers) is a party to the litigation and that its motion to modify the Decree in similar particulars must be entertained on the merits. Hence the district court must, insofar as FOP is concerned, deal with issues similar to those raised by the non-minority applicants. Second, the applicants seek only to modify two allegedly unconstitutional aspects of the Consent Decree, and to enforce a third. They do not seek to attack or relitigate the entire Decree.[11] In any event, the grant of leave to intervene could, if necessary, be conditioned on the intervenors' acceptance of discovery already made, or their stipulation that they would confine their challenge to certain issues. Indeed, the Consent Decree has not been fully implemented and the parties will undoubtedly seek the court's enforcement or modification power in the future. Thus granting the intervention petition would not reopen matters which have been fully resolved, nor would it haul the parties back into court for, as I have pointed out, they are already there. Finally, the proposed intervenors seek only to modify the Decree prospectively, and thus will prejudice no one who was hired or promoted under the present Decree.[12]
 
 
 64
 In light of the above considerations, I conclude that the applicants' petition for intervention was timely, and that it was an abuse of discretion for the district court to hold otherwise.
 
 II
 
 65
 To summarize, I agree with the majority that FOP was already a party-defendant to this litigation, and that the district court was correct in denying its motion to intervene for that reason. I also agree that the McKnight class (the present non-minority police officers) is adequately represented by FOP, and therefore its motion to intervene was properly denied.
 
 
 66
 However, contrary to the majority, I do not think that the McDonald class has been or could be adequately represented in this litigation, either by the State or by FOP. Consequently, I believe that the district court erred in denying the applicants' motion to intervene, and that we must reverse that part of the district court's order and direct that the district court enter an order permitting intervention, without the requirement of further proceedings in this regard by the district court.
 
 
 
 [1]
 Although the complaint was filed on November 16, 1973, it did not allege a violation of Title VII of the Civil Rights Act of 1964, Pub. L. No. 88-352, 78 Stat. 255, 42 U.S.C. § 2000e Et seq. Apparently, the reason for this was the exemption for state and local governments originally incorporated in Title VII and not removed until March 24, 1972, the effective date of the Equal Employment Opportunity Act of 1972, Pub. L. No. 92-261, 86 Stat. 103
 
 
 [2]
 There is nothing in the record to explain why the FOP has undertaken to manage and finance the litigation for the McDonald class, which is not part of the bargaining unit it represents
 
 
 [3]
 Article VIII of the consent decree provides that "(a)ny party may apply to the Court at any time for an Order modifying any of the terms of this Decree."
 
 
 [4]
 See note 3 Supra
 
 
 [5]
 In considering the adequacy of representation issue, the district court may wish to consider the relevancy of the fact that the McDonald class litigation has thus far been funded by the FOP
 
 
 [1]
 As I understand the majority opinion, on remand the district court should entertain and decide FOP's motion to modify the consent decree on the merits, since FOP has been held to be a party and since FOP during the course of the proceedings below had previously moved for modification. See Article VII of the Consent Decree
 
 
 [2]
 It may be that the proposed intervenor has the burden of showing that his representation is inadequate. That burden, however, is "minimal." Trbovich v. UMW, 404 U.S. 528, 538 n. 10, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972). It has been contended that since the 1966 amendment to Rule 24, if interest and impairment are shown, the proposed intervenor Must be allowed to intervene unless the court is persuaded that representation is adequate. 7A Wright & Miller, Fed.Prac. & Proc. § 1909, at 521. In other words the burden of persuasion shifts to the opponents of intervention to show adequacy of representation. See Nuesse v. Camp, 128 U.S.App.D.C. 172, 385 F.2d 694 (1967); Smuck v. Hobson, 132 U.S.App.D.C. 372, 408 F.2d 175 (1969)
 
 
 [3]
 Rizzo v. Commonwealth, 530 F.2d 501 (3d Cir.), Cert. denied, 426 U.S. 921, 96 S.Ct. 28, 49 L.Ed.2d 375 (1976), concerned a civil rights suit by black firefighters against the Philadelphia Fire Department. Several white firemen sought to intervene as defendants. In affirming the district court's denial of their petition to intervene, this court, per Judge Aldisert, stated that "a presumption of adequate representation generally arises when the representative is a governmental body or officer charged by law with representing the interests of the absentee." 530 F.2d at 505. I would note that the proposed intervenors in Rizzo were already employed by the Fire Department, and did not include applicants for employment. In this case, however, the McDonald class (the proposed intervenors) is comprised solely of applicants for employment, as to whom such a presumption of adequate representation seems vastly more tenuous
 
 
 [4]
 See, e. g., Smuck v. Hobson, 132 U.S.App.D.C. 372, 408 F.2d 175 (1969), a suit against the District of Columbia Board of Education. In Smuck, parents of school children were allowed to intervene to appeal the district court's decision when the Board decided not to appeal, even though the Board adequately represented the intervenors at the trial below. 132 U.S.App.D.C. at 372, 408 F.2d at 175. See also Liddell v. Caldwell, 546 F.2d 768 (8th Cir. 1976), Cert. denied, 433 U.S. 914, 97 S.Ct. 2987, 53 L.Ed.2d 1100 (1977), a school desegregation class action brought by black parents, in which several black pupils and the NAACP were permitted to intervene after a consent decree had been approved. The court allowed pupils and the NAACP to intervene because the plaintiffs had allegedly abandoned their original desegregation goals by signing the consent decree. 546 F.2d at 772
 
 
 [5]
 Also, See, e. g., Holmes v. Gov't. of the Virgin Islands, 61 FRD 3 (D.V.I.1973), in which the court held that the Government did not adequately represent a private corporation even though both sought a determination that a particular statute was valid so that a particular project could go forward. The court reasoned that while the corporation had a large, immediate financial interest in the project going ahead as planned (I. e., under the challenged statute), the Government might conclude that a change in plans would be acceptable and that the statute in question therefore need not be vigorously defended. See also Brennan v. Pipefitters, Local No. 449, 64 FRD 633 (W.D.Pa.1974)
 
 
 [6]
 The district court held the motion to be untimely. This court may reverse, of course, only for an abuse of discretion. NAACP v. New York, 413 U.S. 345, 365, 93 S.Ct. 2591, 37 L.Ed.2d 648 (1973)
 
 
 [7]
 Nonetheless, the requirement of timeliness is a flexible one, 7A Wright & Miller, Fed.Prac. & Proc. § 1916, and must be determined by an examination of all the circumstances, of which the point to which the suit has progressed is just one, NAACP v. New York, 413 U.S. 345, 365, 93 S.Ct. 2591, 37 L.Ed.2d 648 (1973). The fact that a Consent Decree has already been entered is not an absolute bar to intervention. EEOC v. AT&T, 506 F.2d 735 (3d Cir. 1974)
 
 
 [8]
 Cf. AISI v. EPA, 560 F.2d 589 (3d Cir. 1977), where this court took the extraordinary step of recalling its mandate because the court's decision was inconsistent with a subsequent decision of the Supreme Court, as well as with all other circuit decisions dealing with the matter. We noted that one of the bases for granting the recall was that our first decision did not result in a money judgment or other inherently final relief, but rather was of "a continuing nature." Thus "recall of the mandate (was) not especially disruptive of the interests in finality of judgments." Id. at 599
 
 
 [9]
 Until the criteria are developed and validated, a 1:1 minority to non-minority hiring ratio will remain in effect
 
 
 [10]
 See also United States v. United States Steel, 548 F.2d 1232 (5th Cir. 1977) (union could not intervene to challenge consent decree, filed a year before motion, because of prejudice to EPA in its attempt to effect clean air implementation plan)
 
 
 [11]
 See Hodgson v. UMW, 153 U.S.App.D.C. 407, 473 F.2d 118 (1972)
 
 
 [12]
 A third factor to consider in determining timeliness is the reason for the delay. Commonwealth v. Rizzo, supra; Nevilles v. EEOC, supra. As I noted above, the reason for the "delay" was the fact that the events giving rise to their claims for relief did not take place until well after the Decree had been signed