**ORANGE ENVIRONMENT, INC., Arthur E. Soons and Sandra Soons, Plaintiffs,**

**Hudson Riverkeeper Fund, Inc., Intervenor–Plaintiff,**

v.

**COUNTY OF ORANGE, et al., Defendants.**

**No. 91 Civ. 8688 (GLG).**

United States District Court, S.D. New York.

March 17, 1993.

Shamberg, Marwell, Cherneff, Hocherman Davis & Hollis, P.C., Middletown, NY, for proposed intervenor-defendant; James G. Sweeney, of counsel.

Michael H. Sussman, Goshen, NY by Michael H. Sussman, Kathleen A. Mishkin, and

Scott A. Thornton, for plaintiff Orange Environment, Inc.

Jeffrey P. Soons, Charlottesville, VA, for plaintiffs Arthur and Sandra Soons.

Natural Resources Defense Council; Robert F. Kennedy, Jr., of counsel and Pace Environmental Litigation Clinic, Inc., John Jay Legal Services, Inc., White Plains, NY; Steven P. Solow, of counsel, Athena Tsakanikas and Marla E. Wieder, Legal Interns, for intervenor-plaintiff Hudson Riverkeeper Fund.

Nixon, Hargrave, Devans & Doyle, Rochester, NY, for defendant County of Orange; Michael R. Wolford and Robert B. Calihan, of counsel.

## OPINION

GOETTEL, District Judge.

## I. FACTUAL BACKGROUND

A new chapter has opened in the case involving the Orange County's municipal landfill. Since much has transpired in this action, we make no attempt to explain its history. For a detailed review of its background, we refer to our last opinion of January 20, 1993. *See Orange Environment, Inc. v. County of Orange*, 811 F.Supp. 926 (S.D.N.Y.1993). Instead, we shall outline the most recent and relevant events that led to the present motion.

Plaintiffs Orange Environment, Inc., a not-for-profit New York corporation, and Arthur and Sandra Soons commenced this action in December 1991 against the County, its Department of Public Works, and several County officials. Among other things, they claim that certain unpermitted discharges of pollutants on federally protected wetlands had occurred violating the Clean Water Act, 33 U.S.C. § 1251 *et seq.* (the "CWA"). Plaintiffs also claim violations of the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 *et seq.* ("CERCLA") and various state laws.

The County Attorney, in consultation with the defendant County Executive, Mary McPhillips, retained the law firm of Nixon, Hargrave, Devans & Doyle to represent defendants in the federal action. The County Legislature was informed of the suit and tacitly agreed to Nixon Hargrave's representation. Indeed, the legislature periodically consulted with the law firm over strategy as the litigation progressed.

After the County suspended its construction activities at the landfill and the Environmental Protection Agency ("EPA") commenced an investigation, the County and the EPA began negotiating a Compliance Order. In July 1992, the EPA issued its Compliance Order. The Order required the County to restore lost wetlands offsite and, subject to its satisfactory completion, allowed the County to recommence a phased operational use of the landfill expansion.

Following the issuance of the Compliance Order, plaintiff filed a motion for a preliminary injunction in this court. The Hudson Riverkeeper Fund, Inc. (the "Riverkeeper"), a second citizens environmental group, simultaneously moved to intervene. The permissive intervention was granted and decision on the preliminary injunction motion was reserved pending an evidentiary hearing at which time the preliminary injunction motion would be consolidated with a decision on a permanent injunction.

In August 1992, the New York Department of Environmental Conservation ("DEC") issued a permit to operate three of the seven subcells of Phase I of the landfill expansion. The DEC attached a large number of conditions to its permit that the County must meet before operations can commence including repair of Phase I's leaking liner system and completion of Phase II's construction.

In January 1993, pursuant to an agreement between the parties and the court, plaintiffs and defendants each submitted motions for summary judgment. Plaintiffs sought a declaratory judgment that the defendant County's unpermitted use of the landfill represented a continuing violation of the CWA since no permit had been secured from the Army Corps of Engineers before recommencing landfill operations. The parties agreed that the permit issue might be decisive.

On January 20, 1993, this court issued an opinion on these summary judgment motions. We held that the Compliance Order issued by the EPA to the County did not erase the County's obligation under the CWA to secure a § 404 permit from the Army Corps of Engineers before commencing operations at the landfill expansion.

Shortly after the court's decision was received by the parties, the County Executive announced that the County would no longer pursue opening the landfill and stated her intention not to appeal the court's decision. The County Executive based her decision on the limited life of the landfill compared to the time and costs of continuing litigation to pursue its opening. The land underneath the landfill expansion site lies within the Southern Wallkill Valley Aquifer which has been designated a "principal aquifer" by New York State. Under state regulations, the landfill expansion site must be closed by December 31, 1995, the latest date a landfill sitting atop an aquifer can be operated.

On February 2, 1993, the County Executive delivered correspondence to the Legislature's Chairman, Edward Diana, formally communicating her intention not to appeal the decision and instead attempt to settle the case. Settlement discussions between the County and plaintiffs ensued. Later that same day, at a special session, the Legislature adopted Resolution No. 12 authorizing an appeal of this court's January 20th decision and the retention of Nixon, Hargrave to prosecute the appeal. The Resolution stated that in the event Nixon, Hargrave declined to represent the legislature, its Chairman was empowered to retain legal counsel for the appeal.[1] The TIMES HERALD RECORD, a local newspaper in Orange County, report-

ed the following day that several lawmakers said the appeal was needed to strengthen the County's position in any settlement negotiations and as a means of trying to avoid paying legal fees to the plaintiff organizations.

On February 4, 1993, Nixon, Hargrave informed the Legislature that it had been instructed by the County Attorney and County Executive not to proceed with an appeal and its contract of representation precluded it from representing the Legislature under the circumstances.

Before the court today is a motion by the County Legislature to intervene as a necessary party pursuant to Fed.R.Civ.P. 24(a)(2). Additionally, the Legislature requests pursuant to Rule 54(b), Fed.R.Civ.P., certification that the court's January 20, 1993 decision is a final judgment for purposes of appeal. This motion is opposed by all the parties presently part of this suit.

## II. DISCUSSION

It seems perfectly obvious that the motion presently before the court does not stem from any rarified legal dispute but rather is the product of divisive partisan politics that has smoldered in Orange County for some time, and occasionally erupted into pitched battle. The Republican-controlled County Legislature, irked at the Democratic County Executive's refusal to appeal this court's January 20, 1993 decision, seeks to intervene as a matter of right for the purposes of pursuing the appeal.

### A. The Legislature's Standing

■ In general, only a party of record in an action, including those who have been

---

1. As recognized recently by a New York court presiding over an Article 78 proceeding commenced by the Orange County Legislature against the County Executive, the Charter does not establish a resolution as a legally binding instrument upon the County Executive. *See In re Orange County Legislature v. McPhillips,* No. 2953/92 (Sup.Ct. September 24, 1992).

In that case, the Legislature sought an order compelling the County Executive to comply with and execute a resolution directing the County Executive to recommence an eminent domain proceeding to condemn property needed for the construction of a new county jail. The state

court, characterizing resolutions as statements of policy or declarations of opinion, held that "the Orange County Charter does not set forth a power of the County Legislature to compel the executive branch of government by virtue of the enactment of a resolution." *Id.* at 5.

This case stands in a slightly different posture. The Legislature is not seeking to compel the County Executive to do anything. Rather, in the face of the County Executive's apparent decision to forego an appeal, the Legislature has resolved to intervene as a party to this action and pursue the appeal on its own.

permitted to intervene, may appeal. *Farm-land Dairies v. Com'r of New York Dep't of Agr.*, 847 F.2d 1038, 1043 (2d Cir.1988). As the plaintiff-intervenor Riverkeeper points out, the initial issue is whether the Legislature has standing to intervene as a necessary party to this action. This issue turns on whether the Legislature has rights or interests as a representative of the County which are being usurped, or at least not protected, by the present County defendants. To make such an inquiry, we must first understand the nature of the Legislature's interest in this litigation. We shall focus on the responsibility over landfills and the prosecution of civil actions is apportioned between the branches of the County government.

■ To establish standing, the County Legislature must demonstrate, *inter alia,* an actual or threatened injury to interests that are arguably within the zone of interests to be protected or regulated by Charter or applicable state statute, and which is capable of judicial redress. *See Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982); *Ass'n of Data Processing Serv. Organizations, Inc. v. Camp,* 397 U.S. 150, 152–53, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970).

In the present case, the Legislature claims that its ability to participate in the litigation process, as the body of County government with ultimate responsibility for the landfill, will be destroyed unless it is permitted to intervene. In essence, the Legislature argues that, as the real party at interest, the decision to appeal is a policy determination that the Legislature has made by resolution, but whose implementation is being frustrated by the County Executive. In our view, the Legislature's position boils down to an argument that the County Executive's refusal to appeal in effect nullifies the resolution passed by the Legislature at the February 2nd special session pursuant to its ultimate policy-making powers for the landfill.

Courts have held that executive actions which nullify a legislator's (or legislature's) vote, or impact on its effectiveness, may provide standing to raise claims of injury to the legislative body's statutory interests or

rights. *See, e.g., Coleman v. Miller,* 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939) (state legislators have a "plain, direct, and adequate interest in maintaining the effectiveness of their votes."); *Dennis v. Luis,* 741 F.2d 628, 631 (3rd Cir.1984) (the governor's appointment of an "acting" official may usurp state legislators' right of advise and consent); *Kennedy v. Sampson,* 511 F.2d 430 (D.C.Cir. 1974) (use of pocket veto effectively disenfranchised a legislator with respect to a particular bill).

To determine whether the County Legislature has stated a claim that their institutional functions or rights are being infringed upon, or at least ignored, by the existing County defendants, we must first understand the statutory structure of the Orange County government. We begin with the Orange County Charter which sets out the respective powers and duties of the County's executive and legislative branches.

The Charter designates the County Legislature as:

> the legislative, appropriating and policy determining body of the County. Except as may otherwise be provided in this Charter or the Administrative Code, it shall have and exercise all the legislative powers and duties now or hereafter conferred or imposed upon it by this Charter or said Code ... together with all the powers and duties necessarily implied or incidental thereto.

Orange County Charter, § 2.02. Among the Legislature's specific powers enumerated in the Charter that are arguably pertinent to this case is its authority to adopt by resolution all necessary rules and regulations for its conduct and procedure (§ 2.02(a)); to make appropriations (§ 2.02(b)); to exercise all powers of local legislation in relation to enacting, amending or rescinding local laws, charter laws, legalizing acts or resolutions (§ 2.02(d)); to enact, amend, or rescind local laws, ordinances, legalizing acts or resolutions (§ 2.02(h)); and to obtain and employ professional and technical assistance and advice (§ 2.02(q)).

The County Executive, as chief executive officer of the County, exercises "all the executive and administrative powers and duties"

together with all the necessarily implied and incidental powers by them. *Id.* at § 301. The County Executive's specific powers relevant to this action include the supervision and control of all departments (§ 3.01(e)); the approval or disapproval of all proposed local laws (§ 3.01(k)); and the making, signing, and implementation of all contracts on behalf of the County (§ 3.01(m)).

Appointed by the County Executive, the County Attorney is designated as the sole legal advisor for the County and its executive units and officers, other than the Legislature. *See id.* at § 6.02(a). The County Attorney is expressly responsible for prosecuting and defending "all civil matters and proceedings involving the County and its executive units, including its officers, other than the Legislature and its officers." *Id.* at § 6.02(c). The County Attorney is also empowered to retain "special counsel" where necessary and appropriate. *Id.* at § 6.05.

In 1992, the County Legislature amended the Charter to create the position of Counsel to the Legislature. *See* Orange County Charter § 2.07. The new position would be appointed by the Chairman of the Legislature and directly responsible to Legislature alone as its sole legal advisor and representative. *Id.* at § 2.07(a)(1). The Counsel's responsibilities include preparation of all forms of local legislation and other unspecified related duties. *Id.* at § 2.07(a)(2) & (3). Significantly, Counsel to the Legislature is not empowered to represent the County in civil litigation. The Charter reserves that role solely for the County Attorney.

This is not a motion to safeguard the prerogatives and rights of a legislature. In fact, the Legislature noted that its arguments "do not impact on any larger issue concerning the respective powers of the Orange County Legislature and the Orange County Executive" but is "narrowly focused upon the privileges, duties and obligations of the Orange County Legislature *with respect to the Orange County Landfill only.*" Legislature's March 2, 1993 Reply at 2 n. 1.

In our view, the present issue represents a squabble over litigation tactics, a political disagreement over how best to represent the interests of the community. No one disputes that the Legislature retains a vital interest in the operations of the landfill. However, the interests at stake in the decision to appeal do not directly implicate the Legislature's policy-making powers over landfills or its more general appropriations authority. Any injury caused by the County's failure to appeal the January 20, 1993 decision will be borne by the County as a whole, *i.e.* by its citizens, who may lose the opportunity to challenge our holding that a § 404 permit is required to commence operations at the landfill expansion site.

In this regard, the Charter entrusts the County Attorney, answerable to the County Executive, with the responsibility of representing the County in "all civil matters or proceedings involving the County." Orange County Charter at § 6.02(c). A recent amendment to the Charter carved out an exception to this general rule of representation by the County Attorney for matters involving the Legislature and its officers. *See id.* The Legislature, recognizing this limitation, attempts to frame its arguments by stressing how its policy-making powers for the landfill are at stake.

■ We do not share its viewpoint. The present litigation does not concern the Legislature *qua* Legislature; it concerns the interests of the County as a whole. The County Legislature undoubtedly has institutional interests in its appropriations and lawmaking powers under the Orange County Charter. However, the Legislature's interests in this matter are identical to those of the County and the County Executive, namely pursuing the best interests of the citizens of Orange County. In particular, the question is what course of action concerning the operations and opening of a landfill will best serve the community?

These issues are of justifiable concern to every citizen of Orange County; they are not particular to the legislative body. The Legislature states that "[i]ndeed there did not seem to be any question that the defendant 'Orange County' was in fact the Orange County Legislature being the policy making body of Orange County Government." Legislature's Brief at 3. It reiterated this idea

in a recent letter stating, "it, and not the County Executive, is the real party in interest in this matter when it comes to a policy decision regarding the Orange County Landfill." Legislature's March 2, 1993 Reply at 4.

To bolster its position, the Legislature cites the case of *U.S. v. City of Yonkers*, 856 F.2d 444 (2d Cir.1988) as an example of a local government in which the city and its city council which set municipal policy were deemed interchangeable. In that case, the Second Circuit recognized that "[f]or purposes of taking official governmental action, the City of Yonkers is the City Council and vice versa." *Id.* at 458. The court stressed that the "Council sets municipal policy, it appoints and can replace the city manager, and it is the principal agency of governance for the City. *There is not even a separately elected executive authority.*" *Id.* (emphasis added). As the court noted, Yonkers' mayor was not an independent executive but rather a member of the City Council elected on a citywide basis instead of from a district as the other Council members. Without a truly separate executive branch, the structure of governance in the City of Yonkers has little application to the present case. The teaching of the City of Yonkers cases is not that "the Legislature *is* Orange County" as the Legislature contends. *See* Legislature's March 3, 1993 Reply at 4.

Orange County's County Executive is elected to an independent executive branch. She retains significant powers apart from the Legislature as its check and balance, closer in nature to the President in our federal system, or the Governor of New York. *See In re Orange County Legislature v. McPhillips*, No. 2953/92 (Sup.Ct. Sept. 24, 1992). As the state court in *McPhillips* noted:

> The County Executive is more than just a Chief Administrative Officer of the County. The County Executive is a duly elected official who sets the policy of the executive branch of the government. Indeed, the executive branch is entrusted by the people of the County of Orange with a check and balance against the acts of the Legislature.

*Id.* at 5.

Therefore, we cannot agree with the Legislature that it must be considered the func-

tional equivalent of the County in this litigation. As we have observed, the defendant County represents the citizens collectively, not the legislature.

Moreover, the Legislature is not the only policy-making body of the County for landfill issues. In November 1991, the Legislature amended the Orange County Charter formally assigning certain responsibilities for environmental facilities and services to a newly-created County Department of Environmental Facilities and Services ("DEFS"). *See* Orange County Charter § 24.02(2). The Department is run by a Commissioner, approved by the Legislature, but appointed by, directly responsible to, and serving at the pleasure of the County Executive. *Id.* at § 24.01. The Commissioner, who may also direct a division within DEFS, holds authority over the Director of the Division of Solid Wastes, the governmental body "directly responsible for the design, construction, operation, supervision, improvement, maintenance and repair of all ... landfills." *Id.* at § 24.-06.

The Legislature, highlighting New York State's County Law, argues that despite this Charter amendment it retains primary authority over waste disposal systems. Section 215(1) of the County Law gives a County's board of supervisors authority over the general care and control of a county's corporate real and personal property. N.Y. County Law, Art. 5, § 215(1) (McKinney 1991). More important to the Legislature's position is section 226–b of the New York's County Law which speaks directly to solid waste management. It provides that:

> "[t]he legislative body of any county may appropriate and expend such sums as it may deem proper to provide for the separation, collection and management of solid waste in such county and for that purpose may acquire, construct, operate and maintain solid waste management facilities, acquire the necessary lands therefor, and purchase, operate and maintain all necessary appliances appurtenant thereto."

N.Y. County Law, Art. 5, § 226–b(1). Section 226–b(2) then gives the legislature au-

thority to establish by resolution rates and fees chargeable for use of a county waste management facility.

Pursuant to the County Law, the Orange County Legislature was initially entrusted with the responsibilities of appropriations, creation, and management of county landfills. While retaining the ability to alter the Charter and set policy, it is apparent that responsibilities for the County's landfills are now shared by the County's legislative and executive branches. The Legislature still appropriates, but it has delegated to DEFS direct operational authority for the construction, operation, and maintenance of all landfills. The clear result is shared responsibility over the County's landfills.[2]

At oral argument, the Legislature characterized the division of power over the County's landfill as shared, but not equal. It stressed that its controlling position over the landfill is illustrated by the resolutions it has passed since creating DEFS. After examining the three resolutions submitted by the Legislature, we find them unhelpful. Two of the resolutions, both enacted in 1986, amended the Orange County Solid Waste Management Rules and Regulations and respectively increased the per ton rate schedule for Orange County generated refuse and increased the rates for Borough of Matamoras, Pennsylvania generated refuse. The third resolution, passed in 1992, amended the County's regulations regarding the fees charged for coupon books and single disposals at the landfill.

The decision not to appeal has no proximate impact on the Legislature's express powers to set user fees. New York's County law expressly grants a county legislature authority to establish schedules of rates or fees to be charged for the use of any county solid waste facilities. *See* N.Y. County Law, Art. 5, § 226–b(2) (McKinney 1991). The Orange County Charter grants no other County entity any authority over rates or fees.

The issue of Charter primacy, however, is not determinative here. For our purposes, even assuming the correctness of the Legislature's position that § 226–b gives the Legislature primary authority over the landfill and its delegation of certain powers to DEFS does not divest it of its ultimate authority, the interests of both the Legislature and the County Executive, acting through DEFS, are subsumed within the interests of the defendant County in this case. It is the people of Orange County collectively represented by the County, not the Legislature, who are the real parties in interest. Thus, the operative question becomes who speaks for the County in its litigation. In our view, the answer lies not in a question of Charter primacy over landfill responsibilities but in the division of responsibilities concerning legal representation of the County.

Nowhere in New York's County Law is the Legislature empowered to direct litigation involving the County. The Charter, however, speaks clearly and decisively on this issue. We conclude that this action falls squarely within the parameters defined by § 6.02(c) of the Charter for the County Attorney to represent the County in all civil matters. This case does not involve issues unique to the Legislature or solely within its realm of institutional responsibilities. In its brief, the County implicitly recognizes this fact. As the Legislature put it:

> Throughout this litigation and up to this point in time, all defendants have been represented by Nixon Hargrave Devans & Doyle of Rochester, New York. Up to this point in time, the interests of all defen-

---

**2.** Interestingly, while this motion was pending, the intervenor-plaintiff, the Hudson Riverkeeper Fund, Inc., submitted a copy of a letter dated April 18, 1989 from James Sweeney, the County Attorney (and now counsel for the Legislature) to Wehran Engineering regarding the design and construction of the Orange County landfill expansion. The County Attorney, informing Wehran of changes to the contract and project manual, stated:

> The most important of these changes is to indicate that the "owner" is the County Execu-

tive and not the Department of Public Works. Of course, the County Executive will work hand-in-glove with the Department of Public Works but it is he who will call the ultimate "shot".

We do not read this letter as determinative of which governmental entity has "ultimate" responsibility for the Orange County landfill, or its expansion. It simply supports our view that the County Executive and Legislature share responsibility for the landfill.

dants seemed to be simultaneous and completely in harmony with each other. Legislature's Brief at 3. It continued by saying, "Indeed, the Orange County Legislature had no reason to even think of intervention until the County Executive made her February 2, 1993 announcement. Up until that point their respective litigation positions were harmonious." *Id.* at 29. According to the Legislature, its interests diverged from those of the defendants only after the County Executive voiced her refusal to appeal. This clearly implies that the interests identified by the Legislature which ultimately diverged involved "litigation positions."

Differing positions on whether to appeal, however, do not raise any separate interests of the Legislature that have been injured. In the present case, the Legislature has no independent institutional interest in appealing. The decision to appeal does not directly implicate any of the Legislature's powers unique to its legislative functions under the Charter. Neither does it fall within the powers and duties enumerated for the Counsel to the Legislature under Section 2.07 of the Charter. Permitting the Legislature's Counsel to appeal simply does not fall into its duties as "sole legal advisor and representative" of the Legislature under § 2.07(a)(1). Neither can it be considered the preparing of legislation pursuant to § 2.07(a)(2).

The Legislature's resolution authorizing its Counsel to appeal in this case must therefore fall within § 2.07(a)(3) which directs legislative counsel to "perform such other related and nonconflicting duties as may be required by the County Legislature." Under the Charter, directing the Counsel to the Legislature to assume authority for appealing this case would conflict with the County Attorney's express authority to appeal on behalf of the County in civil actions. As we have said, the County (meaning the County's citizens) is the real party in interest. The Charter's explicit structure empowers the County Attorney to defend civil matters in which the County, as opposed to the Legislature or its officers, is the real party in interest. *See* Charter § 6.02(c).[3] And for reasons we have already discussed, we believe that the landfill's future is ultimately a matter concerning the County, not solely its Legislature or its County Executive.

The County Executive's decision not to appeal does not suddenly alter the Legislature's interests in this case. When the County Executive informed the Legislature by letter on February 2, 1993 that no appeal would be filed, the Legislature's interests in the landfill remained at that moment exactly as they had been throughout the litigation, that is the public interest.

A failure to appeal does not directly impinge upon, diminish, dilute, or injure the Legislature's lawmaking or appropriation abilities, except perhaps to the extent that they will not have to appropriate any funds to prosecute the appeal. Neither does it erase the Legislature's ability to shape policy regarding the landfill. Our January 20, 1993 decision only held that a § 404 permit was required before landfill operations could commence at Phase I. As a policy matter, the Legislature may decide to pursue a § 404 permit; it might decide to terminate the plans for opening the landfill, or a portion of the expansion site. Whatever path the Legislature determines to follow, the interests motivating such decisions, as with the decision to appeal, remain unchanged and dovetail completely with the interests of the existing defendants.

The County Attorney, under direction from the County Executive, has determined that an appeal is not in the public's best interests. The ensuing litigation costs, she concluded, would only undermine the landfill's questionable economic and environmental viability. We might interpret the County Executive's conclusions to mean that an appeal would only serve to draw more public funds into a money pit with a limited beneficial lifespan. In the Legislature's view, this litigation tactic is a mistake, the wiser course

---

**3.** In this sense, the role of the County Attorney is not unlike that of the Attorney General for the State of New York who represents New York's citizens as a whole and the public interest. The Attorney General is charged with the responsibility to "[p]rosecute and defend all actions and proceedings in which the state is interested ... in order to protect the interest of the state ..." N.Y.Exec.Law § 63(1) (McKinney 1991).

being to appeal, at the very least to enhance the County's leverage in settlement negotiations and avoid paying attorneys' fees to plaintiffs. *See* Affirmation of Michael Sussman, Exhibit E. However, this quarrel over litigation tactics does not represent a legally cognizable injury to the County Legislature providing it standing to intervene.

### B. Intervention Under Rule 24(a)

■ Our conclusion that the Legislature has no standing under the circumstances to claim any injury to its institutional interests or rights dovetails with our determination that the Legislature has not satisfied the criteria for intervention pursuant to Rule 24(a). To intervene as a matter of right under Rule 24(a), the Legislature must 1) file timely; 2) demonstrate a sufficient interest in the actions; 3) show an impairment of that interest arising from an unfavorable disposition; and 4) have an interest not otherwise adequately protected. *Farmland Dairies,* 847 F.2d at 1043; *United States v. Hooker Chemicals & Plastics Corp.,* 749 F.2d 968, 983 (2d Cir.1984).

■ Failure to meet any one of these requirements is sufficient to defeat a motion to intervene under Rule 24(a). *United States v. New York,* 820 F.2d 554, 556 (2d Cir.1987). In applying these requirements, we attempt to assess the range of interests at stake, remembering both the framework of County government that forms the backdrop of this motion and the present posture of the litigation. *See Hooker,* 749 F.2d at 983.

■ Since the County has been a party to this action involving a matter of sovereign interest, here a publicly owned and operated landfill, the County is presumed to represent the interests of its citizens. *See id.* at 984; *Environmental Defense Fund, Inc. v. Higginson,* 631 F.2d 738, 740 (D.C.Cir.1979). The County acts here in its capacity as *parens patriae,* the guardian, benefactor, and representative of all her citizens concerning matters of waste disposal and the environment. To intervene, the Legislature, as a political subdivision of the County, must overcome the presumption of adequate representation by showing that its interests are different than those of the government and

that its interests will not be represented by the government. *See Hooker,* 749 F.2d at 984–85; *Delaware Valley Citizens' Council for Clean Air v. Pennsylvania,* 674 F.2d 970, 973 (3rd Cir.1982).

We find that the Legislature's motion fails on at least two of these criteria. We might agree that the Legislature, as the elected representatives of the County's citizens with policymaking authority, retains an interest in this litigation. In stressing this notion, the Legislature highlights sections 215(1) and 226–b of New York State's County Law. These provisions vest the legislature with the power, duty, and responsibility of acquiring, constructing, operating and maintaining a solid waste disposal program. It thus argues that state law confers on it a controlling interest in the landfill that satisfies Fed. R.Civ.P. 24(a)(2)'s interest requirement.

Without debating this point, the key question is still whether its interests are adequately protected by the existing defendants and whether the Legislature's interests are infringed upon by the decision not to appeal. The crux of the Legislature's argument is that the failure to appeal demonstrates that the representation by the existing parties in inadequate. We are unpersuaded. Until the County Executive announced her decision not to appeal, the Legislature's interests were admittedly "harmonious" with those of the defendants County and County Executive. Indeed, the Legislature implicitly consented to the County Attorney's retention of Nixon Hargrave to represent the County defendants. Since plaintiffs instituted this action, the Legislature has also concededly involved itself in the conduct of the case, providing advice to Nixon Hargrave and receiving updates on the course of litigation. Between January 1992 and January 1993 the Legislature and its leadership have received eight separate updates on litigation strategy and the status of certain negotiations. The Legislature has been involved in the litigation since its inception, but only now seeks recognition claiming to be the real party in interest.

■ As we discussed earlier, the only place where the interests of the Legislature

and the present County defendants are not concurrent is where the Legislature's institutional interests are at issue. However, we find the Legislature's reasoning for inadequate representation totally unpersuasive. As other courts have concluded, the fact that the Legislature views the facts or applicable law differently or gauges the County's prospects for success on appeal differently does not make a case for inadequate representation. *See, e.g., Delaware Valley*, 674 F.2d at 974 (quoting *United States v. Bd. of School Commissioners*, 466 F.2d 573, 575 (7th Cir. 1972), *cert. denied*, 410 U.S. 909, 93 S.Ct. 964, 35 L.Ed.2d 271 (1973)). While the County Legislature may have an interest in the appropriations expended for the County's landfill, there is no divergence between its interests and the broader public interests of the County on the primary issues involved in this case.[4]

The Legislature cites *Triax Co. v. TRW, Inc.*, 724 F.2d 1224 (6th Cir.1984), as an example of intervention as of right being granted on the basis of a party's refusal to appeal. In some respects, *Triax* mirrors the case at bar. The lower court in *Triax* granted summary judgment in a patent infringement case holding that two patents were invalid. The plaintiff company, Triax, who sought to enforce the patents chose not to appeal. The patents' inventor who held a contingent interest in the patents moved to intervene pursuant to Fed.R.Civ.P. 24(a)(2).

The Circuit Court, reversing the lower court, permitted the intervention finding that the unusual case of inadequate representation for failure to appeal existed. Representation became inadequate because Triax's decision to forego appeal was animated in part by interests which conflicted with those of the inventor. Once the patents were held invalid, Triax was free from its contractual obligations to the inventor to make certain minimum royalties payments. While Triax walked away from the litigation free and clear, the inventor would lose not only his royalties but also his ability to ever again profit from his inventions and, by the operation of collateral estoppel, his ability to ever challenge other alleged infringers. *See id.* 724 F.2d at 1228. These interests of the inventor were neither shared nor protected by any of the parties in the action.

While a failure to appeal also forms the basis of the Legislature's motion to intervene, there is one overriding difference between *Triax* and the present case. The Orange County Legislature has no underlying interests at stake regarding the landfill which conflict with the basic interests of the County, or the County Executive. All County entities must have the same interests at heart, namely the public interest. Disputes between the executive and legislature over how to best protect the interests of the County's citizens should be settled *before* the County steps into court. Asking the court to settle a political standoff by creating, through intervention, a system of duel representation of the County's interests is untenable.

The one possible exception to congruent interests between the Legislature and the County Executive would be if any of the Legislature's institutional interests were being compromised. The Legislature identifies one, its interests as the ultimate policymaker for the County's landfills. A failure to ap-

---

4. We also question the timeliness of the Legislature's motion to intervene. Timeliness is assessed using four factors: 1) length of time the applicant knew or should have known of its interest before making the motion; 2) prejudice to existing parties resulting from applicant's delay; 3) prejudice to the applicant if the motion is denied; and 4) the presence of unusual circumstances militating for or against intervention. *Farmland Dairies v. Com'r of New York Dep't of Agr.*, 847 F.2d 1038, 1044 (2d Cir.1988).

Besides the fact that the Legislature has been fully aware and actively involved in this action since its commencement, intervention will cause the existing parties substantial delays in resolving the remaining environmental issues in the case. The parties are engaged in settlement negotiations regarding the status of the portions of the landfill which remain over wetlands that may still survive. Obviously, any added delays that forestall resolution of these environmental issues risks great prejudice to the parties and the general public. Further, as we have found, the Legislature will suffer no prejudice to any of its institutional interests or rights by denying its motion to intervene. Our desire to avoid becoming embroiled in the long-running political battle between the County Executive and the County Legislature only strengthens our determination.

**1062**

peal, however, will not undercut the Legislature's ability to continue its regulation of the landfill's operations or management. As highlighted earlier, such powers as its ability to appropriate funds for a county landfill, direct its construction, regulate the user fees and rates, regulate who may use the facility, and under what conditions all remain intact. Most importantly, as we have found, the Charter explicitly gives only one entity the primary responsibility for conducting civil litigation on behalf of the County, the County Attorney.

We also must confront the practical problems with permitting the Legislature to enter this case as a party. In that event, the County's ultimate interests will be represented by both the County Attorney and the Counsel to the Legislature. Between them, who will decide litigation strategy, settlement tactics, means of compliance with later court orders, or even what representations to make to the court?

To complicate matters further, the Legislature's resolution to appeal was supported by fifteen legislators with one opposing and five absent from the vote. The decision to appeal is a relatively straightforward tactical issue and the Legislature, with one voting exception, was of a single mind. What will occur if the legislators are more evenly divided, perhaps exactly split, over how to proceed as more difficult issues arise out of this litigation? The possibility that representation of the County's interests will become even more fragmented is something that cannot be ignored. The practical need for the County to speak with one voice is precisely why the Charter establishes the County Attorney as the sole representative of the County in its legal affairs. Any other arrangement would be unworkable.

### III. CONCLUSION

To conclude, we hold that the Orange County Legislature has no independent standing to intervene in this action and further fails to meet the requirements of Fed. R.Civ.P. 24(a)(2). Because we deny the motion to intervene, we need not reach the issue of certification pursuant to Fed.R.Civ.P. 54(b).

SO ORDERED.